# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JACQUETTA MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: |
| | ) | 2:15-cv-01574-JEO |
| NATIONWIDE RETIREMENT | ) | |
| SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JACQUETTA MILLER, VIRGINIA | ) | |
| MILLER, and MAPLE MILLER, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Jacquetta Miller ("Jacquetta") claims that she is the lawful

beneficiary of a Deferred Compensation Plan account (the "Plan Account") owned

by her late husband Maurice Miller ("Maurice") and administered by Defendant

Nationwide Retirement Solutions, Inc. ("NRS").  (Doc.[1] 1-1 ("Complaint" or

"Compl.")).  NRS removed the action to this court based on diversity jurisdiction

---

[1]Citations to "Doc(s). ___" are to the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the Clerk of the Court.  Unless otherwise noted, pinpoint citations are to the page of the electronically filed document in the court's CM/ECF system, which may not correspond to pagination on the original "hard copy" of the document presented for filing.

(Doc. 1) and filed an answer that also raised counterclaims and a complaint in interpleader against Jacquetta and two new parties: Maurice's ex-wife Virginia Miller ("Virginia") and his mother, Maple Miller ("Maple"). (Doc. 4). Virginia and Maple, in turn, filed counterclaims against NRS and Jacquetta, based on the assertion that it is they, *i.e.*, Virginia and Maple, who are entitled to the proceeds of the Plan Account. (Doc. 22).

# I.

# BACKGROUND

The court previously disposed of various pre-trial motions. The court granted NRS's motion for summary judgment insofar as NRS sought dismissal of all of Jacquetta's claims and all of Virginia and Maple's counterclaims to the extent they might impose independent liability upon NRS beyond payment of the proceeds of the Plan Account, prejudgment interest, or costs. The court also granted NRS's motion for discharge from further liability to the claimants for the proceeds of Maurice's Plan Account, with the understanding that NRS formally remains a party and must pay the proceeds to the successful claimant or claimants as determined by the court, upon being ordered to do so. The primary remaining issue is resolution of the competing claims to the proceeds of the Plan Account. Accordingly, a trial was conducted without a jury at the request of counsel. (*See*

Doc. 52 at 6).

Virginia and Maple each claim one-half of the proceeds of the Plan Account as named beneficiaries upon the death of Maurice together with costs and applicable interest owed by NRS. They also assert a claim for attorney's fees and costs against Jacquetta for filing a frivolous case pursuant to the Alabama Litigation Accountability Act.[2] *See* ALA. CODE § 12-19-20. Jacquetta claims that she is the sole beneficiary of the Plan Account because she and Maurice signed a change-in-beneficiary form in December 2014 naming her as the sole beneficiary of the Plan Account.

## II.

## MOTION IN LIMINE

Also before the court is Virginia and Maple's motion in limine (doc. 49), upon which the court deferred formally ruling prior to trial since this was a non-jury case. In the motion, they (1) seek to have this court prohibit introduction of evidence that contradicts the NRS Plan document or that purports "to set aside the designated beneficiaries set out by the deceased, Maurice Miller" (*id*. at 1 & 3)

---

[2]Their claim for $500,000 in damages under the Act was previously struck by agreement of their counsel. (*See* Doc. 52 at 6).

and (2) argue that a Qualified Domestic Relations Order ("QDRO")[3] was unnecessary in this case (*id*. at 2). Jacquetta responds that she should not be prohibited from offering testimony concerning the change of beneficiary. (Doc. 50 at 1-5). She also argues that (1) Virginia is not entitled to any contributions to the Plan Account that were made after the date of the divorce decree and (2) if the divorce decree controls, Virginia and Maple "have failed, as a matter of fact and law, to introduce any evidence whatsoever as to the 'present value' of Virginia Miller's claim," thus demonstrating a failure of their claim. (*Id*. at 5-6). Still further, Jacquetta asserts that because Virginia and Maple argue that a QDRO is not necessary in this instance, ALABAMA CODE § 30-4-17 effectuated a revocation of their claims and, thereby, they have no claim to the Plan Account. (*Id*. at 6-11). In their reply, Virginia and Maple argue that any evidence offered by Jacquetta concerning statements by Maurice are due to be excluded as hearsay. (Doc. 51 at 1).

The court will address the evidentiary issues presented by the motion in

---

[3]"QDROs are provided for under the federal Employment Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*., and 'facilitate the distribution of pensions and employee benefits that are subject to [the] provisions [of the act].' *Duran v. Duran*, 657 N.W.2d 692, 694 n. 1 (S.D. 2003)." *Romer v. Romer*, 44 So. 3d 514, 516, n. 1 (Ala. Civ. App. 2009). A "QDRO that the trial court enters may do 'nothing more than "implement the division of property as stated in the parties' divorce judgment." ' " *Ex parte Montgomery*, 79 So. 3d 360, 668-69 (Ala. Civ. App. 2011) (quoting *Montgomery v. Montgomery*, 37 So .3d 168, 173 n. 7 (Ala. Civ. App. 2009)).

limine, but will defer an analysis of the substantive matters raised therein until the discussion of the merits below.[4]  First, to the extent any aspect of the motion in limine was not raised by objection at trial, it is deemed waived.

Second, concerning the request to exclude any evidence contradicting the NRS Plan document or "to set aside the designated beneficiaries set out" by Maurice (*id*. at 1 & 3), the court finds the motion to be overly broad.  To the extent Virginia and Maple seek to exclude evidence that tends to change the terms of the Plan document, the motion is moot because counsel for Jacquetta acknowledge that the issue is not the terms of the Plan itself, but whether there has been an effective change of a beneficiary under the terms of the Plan or whether there was substantial compliance with the Plan so that the equities justify a finding for Jacquetta.  Thus, Jacquetta is not seeking to challenge the terms of the Plan.  To the extent the motion seeks to exclude any evidence intended to set aside the designated beneficiaries, the motion is denied.  Such evidence, when properly authenticated, is relevant to the issues in this case.  Accordingly, the motion in limine is denied to that extent.

---

[4]These matters include the arguments (1) about the necessity of a QDRO; (2) that Virginia is not entitled to any contributions to the Plan Account after the date of the divorce decree; (3) that if the divorce decree controls, Virginia and Maple "have failed, as a matter of fact and law, to introduce any evidence whatsoever as to the 'present value' of Virginia Miller's claim"; and (4) concerning the applicability of ALABAMA CODE § 30-4-17.

Third, Virginia and Maple argue that any evidence offered by Jacquetta concerning statements by Maurice is due to be excluded as hearsay. Because of the broadness of this issue, and the importance of placing the evidence in context, the court deferred ruling on this aspect of the motion prior to trial. Instead, it afforded the parties the opportunity to make necessary and appropriate objections during the trial of the case. This was necessary because some purportedly excludable testimony regarding statements by Maurice may be relevant to the issue of Jacquetta's intent in bringing this action when the court is evaluating and determining Virginia and Maple's claim under the Alabama Litigation Accountability Act. The trial findings herein have been made with this understanding in mind.

## III.

## TRIAL TESTIMONY AND EVIDENCE

Maurice was employed by the City of Birmingham ("City") as a firefighter until his retirement in 2015. (R. 43, 87).[5] He participated in a Deferred Compensation Plan that the City sponsored while he was working for the City. (R. 44). NRS is the administrator of that Plan. On October 30, 1990, Maurice executed a Participation Agreement and Payroll Deduction Authorization form

---

[5]References to "R. ___" are to the trial record found at Document 54.

naming his then-wife Virginia as "Beneficiary Name 1" and his mother Maple as "Beneficiary Name 2" of his Plan Account. (Exh. 5).[6] He named his three children as equal contingent beneficiaries should Virginia precede him in death. (*Id*.)

Maurice and Virginia had children who are now adults. (R. 60). Maurice and Virginia divorced on June 26, 2002. (R. 61-62; Exhs. 22 & 23). In the final divorce judgment, each spouse was awarded "50% of both [of their] pension, retirement and 401K plans." (Exh. 22 at VI.B; R. 62). The decree further provides:

> Each party shall hire attorneys to jointly assist in the preparation of all appropriate Qualified Domestic Relations Orders [QDROs] for approval and execution by the Court. The Court retains jurisdiction over the case until all appropriate [QDROs] are executed.
>
> That the [parties] hereby relinquish all their right, title and interest or claim whatsoever with respect to said personal and real property awarded to the other herein and shall execute any and all paperwork necessary to relinquish their right to said items to the other within thirty days of demand by the other. That the [parties] shall indemnify and hold harmless the other from the payment of any liens, mortgages, etc., attached to said properties awarded to each of them respectively except as specifically set out herein.

(*Id*.)

Maurice later married Jacquetta on December 11, 2009. (R. 45, 48). She

---

[6]References to "Exh. ___" are to the trial exhibits.

remained Maurice's wife until he died from cancer on May 15, 2015. (R. 53; Exh. 25). They had a daughter who was born while Maurice was married to Virginia. (R. 48).

On November 24, 2014, Maurice and Jacquetta completed a "DROP Benefit Election Form"[7] with the City of Birmingham Retirement System wherein Maurice elected to roll-over his accrued benefits into an Individual Retirement Arrangement with NRS.[8] (Exh. 21 at 1-2). The benefits were valued at

_____

[7] The term "DROP" commonly refers to Deferred Retirement Option Plans. A DROP plan

> ... is an arrangement under which an employee who would otherwise be entitled to retire and receive benefits under an employer's defined benefit[] retirement plan instead continues working. However, instead of having the continued compensation and additional years of service taken into account for purposes of the defined benefit plan formula, the employee has a sum of money credited during each year of the continued employment to a separate account under the employer's retirement plan. The account earns interest (either at a rate stated in the plan, or based on the earnings of the trust underlying the retirement plan). The account is paid to the employee, in addition to whatever benefit the employee has acquired under the defined benefit plan based on earlier years of service, when the employee eventually retires.

Carol V. Calhoun & Arthur Tepfer, *Deferred Retirement Option Plans*, RIA Pensions & Benefits Week (Oct. 13, 1998), at http://benefitsattorney.com/articles/ria/ (last visited on June 29, 2017).

[8] Jacquetta's consent was required because she was Maurice's spouse at the time. (*See* Exh. 21). On the form, Jacquetta certified that she understood that "because of this election [by Maurice], any benefit [she might] receive after the death of [Maurice] will be lower than it would otherwise have been." (*Id.*) The form further states that Jacquetta "acknowledge[s] that [she] ha[d] the right to reject [Maurice's] election of the DROP benefit, but nevertheless consent[s] to the selection...." (*Id.*) Maurice indicated on this form that he intended to retire on January 5, 2015. (*Id.*)

$109,216.82 at the time, and were, according to the City's documents, a lump sum equal to 36 monthly installments plus interest.  (*Id*.)

According to Jacquetta, during December 2014, she and Maurice met with Jeremy White, the NRS Retirement Specialist assigned to the Plan, at the fire station where Maurice worked.  (R. 45-46).  They met with him intending to take the necessary steps to ensure their daughter would be provided for in the event of Maurice's death.  (*Id*.)  The purpose of the meeting was to have Jacquetta listed as a beneficiary on Maurice's Plan Account.  (*Id*. at 46).  At that meeting, Jacquetta says, she provided White with her driver's license and her Social Security card and she signed a beneficiary form that made her the beneficiary.  They left that form with White.  (*Id*. at 45-49).  During the trial, Jacquetta identified a blank "Beneficiary Change Form" as the document she filled out and signed.  (*Id*. at 49; Ex.10).  At the conclusion of the meeting with White, Jacquetta was satisfied that she had been made the beneficiary of the Plan Account.  She further understood that White was going to do whatever was necessary with the form or forms.  (R. 48).  Neither she nor Maurice ever received copies of the form or forms that were executed that day.  (*Id*. at 47).  Additionally, they never received a letter from NRS indicating that there had been a beneficiary change.  (*Id*. at 5 2-53).

White testified, however, that he received never a change of beneficiary

9

form at any time prior to Maurice's death. (R. 12, 20). He stated that the purpose of the December 9, 2014 meeting at the fire station was simply to roll the money from the City of Birmingham to Maurice's Plan Account.[9] (*Id.* at 11-13, 26, 37). The only form White had Maurice execute was an incoming asset form. (*Id.* at 13, 28). White specifically testified that he did not have Maurice complete any Beneficiary Change Form. (*Id.* at 19-20; *see e.g.* Exh. 10). White did not recall talking with Maurice or Jacquetta about any change of beneficiaries. (R. 37). White also stated that Jacquetta did not complete any forms. (*Id.*) White provided the rollover document to the City so that the transfer of funds could be made. (*Id.* at 29-31, 38-39).[10] White believed the approximate amount of the rollover was $109,000. (*Id.* at 14, 39). Lastly, White stated that he never received any change of beneficiary form from Maurice. (*Id.* 20).

NRS received the funds transfer on March 23, 2015, in the amount of $109,216.74. (Exh. 11 & 12). It was deposited into Maurice's existing deferred compensation plan[11] that was authorized pursuant to Internal Revenue Code §

---

[9]White's calendar confirms the occurrence of a meeting, but adds no other details. (Exh. 19).

[10]Neither White nor NRS maintained a copy of the document. (R. 31-32).

[11]Maurice's Plan entry date was November 20, 1990. (Exh. 2 at Nationwide_171).

457(b).[12]  The Plan Account was a part of the 457(b) Plan.  (R. 38; Exh. 2 at

Nationwide_358, 362-63).[13]

In June 2015, following Maurice's death, Jacquetta, Virginia, and Maple

each executed and submitted to NRS respective claim forms by which each

asserted that she was the beneficiary of Maurice's Plan Account.  (*See* R. 22, 54,

62 & 72; Exh. 14, 15).  At some time around June 2015, after Maurice's death,

Jacquetta met with White and completed an alternate payee/beneficiary form.  (R.

23-24, 39).  White acknowledged during his testimony that he made a mistake in

having Jacquetta complete the form under the circumstances.  (*Id*. at 25).  He

simply assumed she was the beneficiary.  (*Id*. at 40).

On June 15, 2016, Virginia's attorney faxed a letter to NRS advising it of

Virginia's claim to the Plan Account proceeds and requesting that a hold be put on

them pending submission of a QDRO.  (R. 59, 63; Exh. 16).  As a result of the

conflicting claims made by Jacquettta, Virginia, and Maple, NRS placed a hold on

the Plan Account proceeds and did not distribute them to anyone.  (R. 59; Exh.

---

[12]According to White, the City had 90 days to arrange for the transfer of the funds.  (R. 34).  The money was disbursed into two accounts: $99,707.09 into a § 457(b) Rollover (Pre-Tax) Account and $9,509.65 into a § 457(b) Plan Account.  (Exh. 2 at Nationwide_358, 362-63).  For purposes of this case, the court includes both accounts under the term "Plan Account."

[13]The referenced page number is the Bates number assigned by the parties and located at the bottom right-hand corner of the document.

17).  This lawsuit followed.

## IV.

## DISCUSSION

### A.    CLAIM FOR ACCOUNT BENEFITS

While the question before the court – who is entitled to the benefits? – is simple, its resolution is not easy.  Virginia and Maple argue they are entitled to the Plan benefits because Maurice never changed beneficiaries and because the divorce decree specifically provided that Virginia was to be awarded one-half of Maurice's retirement plan.  Jacquetta argues she is entitled to the funds because Maurice executed a change of beneficiary form before his death and the equities warrant a finding that she is entitled to the money even if NRS did not act on the change of beneficiaries request.

As with any contractual dispute, the beginning point is the contract itself. The designation of a beneficiary in a document such as a retirement plan is governed by the terms of the plan document.  *See Aderholt v. McDonald*, — So. 3d —, 2016 WL 7321570, at *3 (Ala. Dec. 16, 2016) ("The law of Alabama is that 'the designation of the beneficiary of a life insurance policy is governed by the provisions of the policy itself.' " (citing *Gibson v. Henderson*, 459 So. 2d 845, 847 (Ala. 1984)).  Where "a spouse is designated as the beneficiary of a public pension

and retirement pension plan prior to the divorce and the beneficiary designation

was not changed by the other spouse after the divorce, then the surviving

ex-spouse is entitled to the accumulated death benefits payable under that plan."[14]

*Pitts v. Vaughan*, 435 So. 2d 83, 85 (Ala. Civ. App. 1982).  Additionally,

> "[a]s it relates to changing beneficiaries, the law of equity regards as
> having been done that which ought to be done and the courts will
> give effect to the intention of the insured by holding that a change of
> beneficiary has been accomplished where he or she has done all that
> he or she could do in order to comply with the provisions of the
> policy." *Ziegler* [*v. Cardona*], 830 F. Supp. [1395,] 1398 [(M.D. Ala.
> 1993], citing *Gibson*, 459 So. 2d at 847.  This has come to be known
> as the "substantial compliance" doctrine.  "The test of substantial
> compliance is whether the insured has done everything that he could
> do to make [a change of beneficiary]." *Ziegler*, 830 F. Supp. at 1398,
> citing *Gibson*, 459 So. 2d at 84[8].

*Midland Nat. Life Ins. Co. v. Turner*, 06-0429-BH-M, 2007 WL 2254419, at *4

(S.D. Ala. Aug. 2, 2007).

The Plan Document in this case provides:

8.01  **Acceptance of Beneficiary Designation by Administrator.**  The
Participant shall have the right to file with the Administrator, a
signed, written beneficiary or change of beneficiary form designating
the person or persons who shall receive the benefits payable under the
Plan in the event of the Participant's death....  A change in the

---

[14]While Jacquetta argues that ALA. CODE § 30-4-17 resulted in the revocation of the
beneficiary designations as a matter of law upon the granting of the divorce, the court notes that
this statute was not effective until September 1, 2015, thirteen years after the decree was entered.
ALA. CODE § 30-4-17 **Effective date** (bold in original).  The further merits of this assertion will
be addressed below.

Beneficiary designation shall take effect when the election is accepted by the Administrator, and must be on a form and in the procedural manner approved by the Administrator.

8.02 **Participant Obligation to File Beneficiary Designation Form.** The Participant accepts and acknowledges that he has the burden of executing and filing with the Administrator prior to the Participant's death a proper beneficiary designation form.

(Exh. 8 at Nationwide_166).

Regardless of whether the court undertakes a strict contractual view or an equitable substantial compliance analysis of this matter, the result is the same – Virginia and Maple are entitled to the benefits from the Plan Account. That being said, the court must make a number of determinations involving credibility choices and reasonable inferences from the evidence to reach its conclusion. First, the court is not convinced that Maurice ever elected to change his beneficiary designations. While Jacquetta testified that she and Maurice completed a change of beneficiary form at the December 2014 meeting, White disputes this testimony. The court was not particularly impressed with the testimony of either witness, but does find Jacquetta's testimony more suspect because it is not consistent with what likely would occur if the "Beneficiary Change Form" had been executed. Specifically, she testified that she provided White with her driver's license and Social Security card, and that she signed the form at the meeting. (*See* R. 47).

However, the Beneficiary Change Form does not require her signature, her driver's license or her Social Security number. (*See* Exh. 10). To the contrary, the form specifically states that a named beneficiary cannot be a witness to the event. (*Id.*) Thus, this evidence weighs against Jacquetta.

Second, as far as the court can discern from the evidence presented, there was no follow-up by Maurice or Jacquetta with White or anyone else at NRS to see that he (White) submitted the requested change. Maurice did not pass away until almost six months after the purported request for a change. This again weighs against a finding for Jacquetta. In reaching this conclusion, the court has not ignored the fact that Maurice intentionally transferred the funds from his City of Birmingham DROP Account to his individual retirement arrangement with NRS, which Jacquetta had to approve as his spouse. This simply is not enough when all the evidence is considered to warrant a determination in favor of Jacquetta.

Third, Maurice agreed as a part of his divorce settlement with Virginia to share his retirement benefits equally with Virginia. (*See* Exh. 22 at 6). This includes the funds at issue in this case. While neither party to the divorce agreement expeditiously prepared the QDROs that might be required to effectuate the transfer of any funds, that does not change their agreement. To the contrary,

the agreement provides that the Circuit Court of Jefferson County would retain jurisdiction over the case until all appropriate QDROs are executed. (*Id*.) Thus, to effectuate the change of beneficiary on the NRS funds advanced by Jacquetta in this action, Maurice would be in breach of the divorce agreement and the divorce decree. Again, this evidence weighs against a finding for Jacquetta.

Fourth, Jacquetta argues that "it stands to reason that a man would favor taking care of his minor child and current spouse over his elderly mother and his ex-spouse with grown, adult children." (R. 87). This statement seems to suggest that Maurice's elderly mother, former wife, and children from that marriage account for very little. Nothing in the record suggests such. To the contrary, Maurice's divorce decree states he intended to share equally with Virginia. Additionally, while Jacquetta argues that Maurice would necessarily have wanted to take care of her and the minor children, she also testified that she was receiving income from Maurice's "pension and widow's benefits." (*Id*. at 45-46).

Virginia and Maple assert in their motion in limine that there is no need for a QDRO in this case because Maurice is deceased and he named his beneficiaries by contract. The court does not find that this argument adds anything significant to the resolution of the present issue. A timely QDRO would have further clarified the issues in this case, but the existence or absence of one is not dispositive of the

matter.  The fact that a QDRO may no longer be necessary is not instructive regarding what occurred in December 2014.

Jacquetta asserts in her response to the motion in limine that if the divorce decree controls, Virginia and Maple "have failed, as a matter of fact and law, to introduce any evidence whatsoever as to the 'present value' of Virginia Miller's claim."  The court first notes that the latest valuation for the Plan Account that was admitted into evidence shows that on March 31, 2016, the account balance was $82,767.75.[15]  (Exh. 2 at Nationwide_395).  In support of this claim, Jacquetta cites *Brattmiller v. Brattmiller*, 975 So. 2d 359 (Ala. Civ. App. 2009).  In *Brattmiller*, the court held that a spouse's failure to offer evidence establishing the "present value" of the retirement benefits in a divorce proceeding precluded the court from awarding her any portion of the benefits.  *Id*. at 363.  Virginia responds that she "is under no obligation to prove the value of the retirement plan as of the date of the divorce at this time."  (Doc. 51 at 2).  She appears to be asserting that the decision of the domestic relations proceeding is final and not to be reviewed by this court.  (*Id*.)

_____

[15]The court notes that there were significant withdrawals or transfers from the Plan Account after the rollover (March 23, 2015) on April 10, 2015.  (*See e.g.* Entries for April 10, 2015, showing two transactions: $14,745.01 and $9,542.42.  (Exh. 2 at Nationwide_372)).  There were other transactions as well.  The balance in the § 457(b) Plan Account was $0.00 at the close of the quarter on June 30, 2015.  (*Id*. at _368).  The other account (§ 457(b) Rollover (Pre-Tax) still had $83,936.16 in it.  (*Id*.)

The undersigned finds that the purported failure to prove the present value of the Plan Account at the time of the entry of the divorce decree is not fatal to Virginia's claim in this case. Initially, the court finds that *Brattmiller* is not controlling in this instance. *Brattmiller* was a contested divorce proceeding that led to resolution on the record before the hearing judge. This case, in contrast, involves an agreed-upon disposition by the parties that was approved by the court. (*See* Exh. 22 at 1 ("Based upon the Agreement of the parties as filed with the Court together with the written Testimony of the Plaintiff and the Waiver filed by the Defendant, the case was submitted for a Final Judgment upon the pleadings and proof as noted.")). Additionally, this challenge by Jacquetta relates to the adequacy of the prior proceeding fifteen years earlier, not the disposition of the claim herein today.

Jacquetta next asserts in her response to the motion in limine that Virginia is not entitled to any contributions to the Plan Account after the date of the divorce decree. Specifically, she states that, if the divorce decree controls, then the "beneficiary designations are moot" because "a court of competent jurisdiction made a finding" that one-half of the proceeds went to Virginia and one-half went to Maurice. (Doc. 50 at 5). The undersigned does not agree with Jacquetta's conclusion. What the decree did was secure one-half of the account for each of

18

parties (Virginia and Maurice). It did not edict that Maurice's prior beneficiary designations were invalid. To the contrary, the way the judgment was entered comports with the then-existing structure of the designation. It did not do away with Maurice's one-half designation to Maple as his mother and then guardian of his children. (*See* Exh. 5 at Nationwide_022).

As a concluding sentence to the foregoing argument, Jacquetta states, "If the court, on June 20, 2002, divided the account with [one-half] to each party, and that order controls, that left nothing to be paid out as a beneficiary designation." (Doc. 50 at 5). For the reasons just stated, and due to the fact that the court finds that Jacquetta is not a beneficiary under the facts, this argument is without merit.

Jacquetta next argues that when the divorce decree was entered, ALABAMA CODE § 30-4-17 resulted in the revocation of the beneficiary designations as a matter of law. (Doc. 50 at 7). She further argues:

> This law is a departure from past case holdings in Alabama, that allowed the beneficiary designation to control. ALA. CODE § 30-4-17 directly applies and controls in this case and was enacted for exactly this type of situation wherein a former spouse might take a windfall from a mistake, forgotten account, or ineffective change of beneficiary.

(*Id*.) Virginia and Maple respond that § 30-4-17 does not apply. They note that Maple is Maurice's mother and that Virginia owns one-half of the account by the

19

divorce decree and argue that Virginia's interest "is no mistake or matter

forgotten." (Doc. 51 at 2).

> In relevant part, § 30-4-17 provides that except as provided by
>
> a governing instrument, a court order, or a contract relating to the division of the martial estate made between the divorced individuals before or after the marriage, divorce, or annulment, the divorce or annulment of a marriage ... revokes any revocable ... disposition or appointment of property made by a divorced individual to his or her former spouse in a governing instrument and any disposition or appointment created by law or in a governing instrument to a relative of the divorced individual's former spouse.

ALA. CODE § 30-4-17(b)(1)a. While this statute is intended to "have the effect of

revoking certain revocable interest[s]," ALA. CODE § 30-4-17 ALABAMA

COMMENT, it does not defeat Virginia's claim in this case for two reasons. First,

the statute was enacted and became effective after the entry of the divorce decree

in this case. Second, even if it were applicable, the Final Judgment of Divorce

entered by Circuit Court Judge John C. Calhoun provides that the parties

"relinquish[ed] all their right[s], title and interest[s] or claim[s] whatsoever with

respect to said personal ... property awarded to the other [t]herein...." (Exh. 22 at

6). This specifically includes their "pension, retirement and 401K plans." (*Id*.)

Accordingly, this court fails to see how § 30-4-17 defeats Virginia's claim in this

instance. The Domestic Relations Division court order specifically addressed the

relevant property and the impact of the divorce decree.

In sum, the court finds that after consideration of the facts and the legal assertions of the parties, a verdict is due to be entered on behalf of Virginia and Maple on their claim to the disputed funds. Judgment is due to be entered on their behalf.

## B.    ALABAMA LITIGATION ACCOUNTABILITY ACT

Virginia and Maple also seek to recover against Jacquetta for filing a frivolous case pursuant to the Alabama Litigation Accountability Act. *See* ALA. CODE §§ 12-19-270 to 274. (Doc. 52 at 6 (Pretrial Order)). Specifically, they seek reasonable attorneys' fees and costs against Jacquetta premised on their assertion that she filed the present lawsuit without substantial justification. ALA. CODE §§ 12-19-271(1) & 272(a).

Under the Act, a court may impose "reasonable attorneys' fees and costs against any attorney or party, or both, who has brought a civil action, or asserted a claim therein, ... , without substantial justification, either in whole or in part." ALA. CODE § 12-19-272(a). The Act defines "without substantial justification" as follows:

> The phrase "without substantial justification", when used with reference to any action, claim, defense or appeal, including without limitation any motion, means that such action, claim, defense or

21

appeal (including any motion) is frivolous, groundless in fact or in law, or vexatious, or interposed for any improper purpose, including without limitation, to cause unnecessary delay or needless increase in the cost of litigation, as determined by the court.

ALA. CODE § 12-19-271(1).

Based on the record before this court, the undersigned cannot conclude that, when Jacquetta filed this action against NRS, it was groundless either in fact or in law. This is demonstrated, in part, on NRS's decision to file its counterclaim and complaint in interpleader. Additionally, resolution of this matter required a full trial. As previously noted, resolution of the question presented was not easy for the court. Had this court found that Jacquetta's evidence was more convincing and sufficient to support a finding that Maurice had done all that he could to effectuate the change of beneficiary, the result of this litigation would have been a verdict in favor of Jacquetta. Accordingly, the court finds that Virginia and Maple are not entitled to recover under the Act. A verdict is due to be entered in favor of Jacquetta on this claim.

## V.

## CONCLUSION

Premised on the foregoing, the court finds the motion in limine (doc. 49) is granted in part and denied in part. Additionally, the court finds for Virginia and

Maple Miller and against Jacquetta Miller on the claim to the Plan Account funds held by NRS. It further finds for Jacquetta and against Virginia and Maple on Virginia and Maple's claim under the Alabama Litigation Accountability Act.

While the court has resolved the dispute between Jacquetta and Virginia and Maple, additional matters remain. These include the following:

1.  The present value of the proceeds to be distributed by NRS;

2.  Whether NRS is responsible for any additional interest or costs; and

3.  Whether NRS is entitled to any relief.[16]

Counsel for Virginia and Maple Miller, the prevailing parties, are encouraged to meet and confer with counsel for NRS to see if these remaining matters can be resolved without further court intervention.

An order consistent with the court's findings will be entered separately.

Further proceedings will be set by separate order.

**DONE**, this 30th day of June, 2017.

_John E. Ott_

_____

**JOHN E. OTT**
Chief United States Magistrate Judge

---

[16]NRS previously sought an award of a "reasonable sum for counsel fees and disbursements for the filing of this interpleader action." (Doc. 4 at 16).